Good morning, Your Honor. Morning. I'm Jeffrey Baird representing Mr. Barrientez. May it please the court. I'm going to talk first about the telephone, the use of a telephone to take testimony from an expert. Telephonic testimony is excluded by the regulations. It's excluded by omission. There's no way to read the relevant regulation and find somehow. Do you have to, do you have to show prejudice? Well, not according to this court in Gutierrez, right? In Gutierrez, there was a clear violation of a regulation. It was the failure to fill in and attach a psychiatric review technique form, even though the other doctors in the record had done it and the administrative law judge referred to them and discussed the issues. So it's the regulatory violation itself, which should constitute harmfulness. Well, if you're, if you're essentially going to characterize it as structural error, what's your best case for that? Is it Gutierrez? Gutierrez, sure. All right. If you, if it has to be, if you have to show prejudice, can you show prejudice? Well here, Dr. McKnight, the expert, did characterize claimant as behaving as if he was more impaired than an Alzheimer's patient. So he did put that seed into the mind of the administrative law judge. If that's true, he also said he listened to the testimony and fashioned his opinion partly based on that telephonic interaction. He did recommend further development, which I'd like to discuss in a minute, but he did prejudice it by putting that seed into the mind of the ALJ. If the ALJ had simply excluded it all, he could have gone ahead with regular development. Well, wait a minute, wait a minute. The prejudice by, by putting that seed into the ALJ's mind, I mean the cure for telephone testimony is okay. Require him to take it in person. Right. Isn't it? So if he testified in person, he's going to put the same seed in the ALJ's mind, maybe even a, you know, bigger seed. Well, we don't know. There's a sobering effect of face-to-face interactions. So important to the agency, apparently, they excluded telephonic testimony from the regulation. Maybe he wouldn't have been so cavalier. Wasn't your client put on notice that he was going to be testifying by telephone on a couple of different occasions and no objection? No, there was objections in this. This was specifically objected to by the claimant's counsel. At the hearing itself, did the claimant's counsel even ask the doctor questions over the phone? I don't recall that he did cross-examination. He was given the opportunity to cross-examine over the phone. He did not. Well, I I'm trying, there were so many hearings and there was even one that wasn't supposed to be there, that he did, the claimant's counsel did object to the telephonic testimony on the basis of the regulation. But the substance that was found was a little mischaracterized by the ALJ afterwards. It's true that Dr. Charleston found malingering or exaggeration. Well, wasn't there at some point that he did worse on a test than, I don't know, like a blind person would have done or something, and they said that... It was the trail-making test or the test of memory malingering. But Dr. Charleston still said, knowing this, he has a great difficulty being around others and a wide variety of social interactions. He's markedly limited substantial loss in the ability to interact with supervisors. Charleston still found there was a panic disorder, which he found also at an earlier examination, and that particular limitation marked substantial loss in the ability to interact with supervisors would be grounds for disability under Social Security Ruling 8515. Also, Dr. Dixon said he's not malingering and again found social functioning fair to poor, cannot easily adjust to new environments, and Dr. Michaels found simple instructions, but occasional to frequent difficulty completing tasks in a timely manner. So why isn't some... there was a lot of evidence, and then he was seen by a lot of doctors, and some doctors he was seen, I don't know, seven times or eight times or whatever. Why isn't it just... why aren't some of these just resolution of, you know, credibility and what you believe and what you don't believe? Well, the ALJ does have great discretion to resolve questions of credibility, and it was very important to the ALJ that the claimant had acted in an exaggerated fashion with some of his doctors, including and especially Dr. Charleston. But that doesn't undermine what the doctors actually found, and again, Charleston's important because he said, malingering. However, it enables substantial loss in the ability to get along with supervisors. So there is still mental substance problems. I mean, there's substantive problems. It wouldn't be a waste of your time if you remanded on a structural error. There is... Well, a structure... I want to get back to that, just for a minute, that telephonic testimony business. You aware of the government's 28-J letter? Yes. Filed on April 9 that cites this apparently new case, Ludwig? Yes. Let me draw a distinction of Ludwig and assert my own 28-J letter. In Ludwig, the administrative law judge was confronted by an FBI agent. The FBI agent came to the ALJ and said, I can see this guy is not using his cane or whatever. He looks like he can walk just fine. The ALJ then reported that to the claimant's counsel and said, I'm not giving it much weight, but I do think you should know. And this court said, that's with intolerability of The ALJ solicited the telephonic testimony specifically over the objection of claimant's counsel. And it was administratively irregular to do that, as well as violating the regulations, because the ALJ is not using... Yeah. The case on the basis of the principles that apply to whether or not, you know, taking telephonic testimony is a structural error. It's whether it's invited or not? Well, the ALJ did it intentionally. The ALJ did it over the objection of claimant's counsel. Whereas in Ludwig, the error wasn't invited. It's a matter of the intent and the state of mind. If the ALJ intends to take telephonic testimony, then one test applies. But if it's taken for some other reason, then it doesn't apply. That doesn't make sense, does it? No, that's not it. It's that with the FBI agent, the FBI agent came to the ALJ and the ALJ admitted, this is irregular and unusual, but I'm not giving it much weight. In our case, the ALJ, over the objection of claimant's counsel, brought in the telephonic testimony. So it's an affirmative, intentional violation of the regulatory... Well, they've been doing this in other cases, right? I mean, this isn't... that doesn't necessarily make it right. But they've got some manual that says that... I mean, the language that you're pointing to says videotaping. And clearly videotaping on the telephone, I mean, you don't have to be a rocket scientist to figure out. And then videotaping, you're looking at the person on the phone. You're not looking at the person. So we have all of that argument. But they have done this in other cases. This isn't... yours isn't the first case where someone's done it, right? Well, we did submit... And there's some manual. Well, the agency ordinarily, the court doesn't enforce agency manuals. The distinction in this case is that the claimant's counsel objected to the taking of the telephonic testimony, called it for the violation it was, and the ALJ went ahead anyway. The case of... Well, doing it wrong over a repeated period of time doesn't make it any more right. But... Well, but the agency manual... You know, anything that's structural error is... There are very few things that are structural error in the law. Because it means, bingo, it doesn't matter what else happens. It doesn't matter even if the person's, you know... And so you're setting the bar pretty high. Well, the Gutierrez court set the bar, and that's what I'm asking you to follow now. That when there's a clear regulation, the ALJ has to follow it. And here, he intentionally didn't follow it. It wasn't as though he was reaching for a standard and not meeting it. He intentionally refused the... Over the objection of the claimant, he refused to follow the regulation. But let me say, there's an interesting HALEX provision, which I cited in the reply brief. The ALJ is supposed to use experts in a rotation, and that would account for appearing in person. There was no particular emergency here. The ALJ sought out this particular medical expert, Dr. McKnight. And the FOIA request in the record on page 870 points out, he does this all the time. He always gets this expert, and he does it by using the telephone. So he can make sure to get the same one. Now, I don't... There's not evidence of actual bias, but it is administrative irregularity and shows why he might be using the telephone. And it's for a questionable reason to always have the same medical expert. After he used the telephone, wasn't your client re-examined again by a couple of more doctors? Right. And those are the ones I just talked about. I think the ALJ's treatment of them was inaccurate. The claimant did exaggerate. He did behave irregularly and malinger. But the doctors saw through that, and they found impairment and limitations nonetheless. So bad in social functioning in particular, or the ability to tolerate changes, or the ability to complete tasks in a timely manner. Those would all fit with disability under Social Security Ruling 8515. But you're not making a claim of, I don't know what it would be, some kind of a bias or irregularity based upon the fact that it looks like this ALJ always calls the same medical expert by phone, and you draw the inference because he does it, because he always gives a certain kind of testimony, right? I think that inference is to be drawn. But is that, I mean, are you, is that one of your contentions? That in effect he didn't get a fair hearing because he had this, you know, biased ALJ in cahoots with a biased medical expert, something like that? Well, that's a plausible inference. I don't think there's. I'm not asking if it's a plausible inference. I'm asking, are you making that contention? I'm not, Your Honor. Assessed it as an argument. Right. What I'm saying is that the ALJ behaved in an administratively irregular way, and if this Court wishes to consult Halleck's, Halleck says he needs to use experts in rotation. It highlights the error of using telephonic testimony when it's excluded otherwise. I'd like to reserve some time and hopefully briefly talk about the physical impairments. Good morning. Good morning. Nancy Michelini for the Commissioner. With regard to. That goes lower if you'd be comfortable with it lower. If you stop the clock on this. Does it go lower or do we. Underneath. Thank you. I appreciate that. Well, I'm sensitive to that because I would need it lower. Thank you. All right. This Court should affirm for three reasons. Could you give us your name? I'm sorry. I'm sorry. Nancy Michelini for the Commissioner. Okay. Thank you. Three reasons. Even if it was error to take telephone testimony, it was harmless. Second, uncontradicted evidence of malingering shows Mr. Barrientos claims are not credible. And third, the ALJ provided a rational interpretation of the evidence and his is not supported by substantial evidence. Well, so what is your position? Videotaping doesn't seem to me to be the same thing as the telephone. So does the agency just regularly do this even though it says videotaping? Yes, the agency does regularly do this and they've been doing it since the 1990s. But it doesn't really make it right if just because you do something enough, you know, like it doesn't make it right just because you keep doing it and doing it and doing it. Correct. I understand what you're saying, Your Honor. The regulations were changed in 2003 to add video teleconferencing, BTC. Prior to that, the regulation said witnesses may appear at a hearing. That's all it said, may. It's permissive. It didn't say shall. And neither did the new regulation in 2003. It didn't say shall. So the new regulation simply accounts for new technology. Now, the telephone's been around a long time. It's not new technology. And they've used the telephone, as I said, since the 1990s. It's just common practice. Thousands of hearings, thousands of ALJ hearings have been held. Is it, is Mr. Robert correct that it's contrary to the HALEX? That it's contrary? No, it's not contrary to the HALEX. In fact, the HALEX instructs, instructs the ALJs to take telephone testimony from EMIs. In fact, it's the preferred way to take, I'm sorry, I'm getting feedback here on the microphone, that it's the preferred way to take telephone testimony. And I believe I noted that in my brief, the specific HALEX provisions. All right. But let's say if we don't choose to decide that issue here, Appellant's Counsel says that Gutierrez mandates this essentially making it structural error, that we can't do a harmless error analysis here. What's your position? That's incorrect. His position is incorrect. He says that the seed was placed in the mind of the ALJ by Dr. McKnight when he testified over the telephone. However, that seed that he's talking about was in Dr. Chalstrom's 2006 report. He said, even people with dementia or TBIs have almost perfect scores on Trial 2 in the retention trial. That's where that came from. Dr. McKnight didn't say, Dr. McKnight was simply parroting what was in the report. He said, there's an inherent problem with the record here. The psychological reports have mixed results. So in order to give Mr. McKnight the benefit of the doubt, send him back for another consultative examination. And that's exactly what the ALJ did. He sent him back for not one, but two consultative examinations. And Dr. Chalstrom's second evaluation confirmed the results of the first. Dr. Chalstrom, I mean, he said, if he's not actually malingering, he is certainly exaggerating the symptoms of his cognitive disorder. This sheds doubt on everything, he says. Now the ALJ considered that and then considered the physical impairments that Mr. Variantes is also claiming that he has and considered, well, the ALJ reasoned, and that's in his decision. In fact, this is probably one of the most well-reasoned, well-articulated ALJ decisions that I've seen in a long time. We don't usually see these decisions at this level. But he said that Mr. Variantes was never actually diagnosed with a panic disorder, with agoraphobia. So Dr. Chalstrom saying that he couldn't get along with other people, co-workers, he said that's just based on his subjective complaints. So back to the... What about the appellant's allegations that the ALJ failed to adhere to the manuals and E-rotation procedure and instead always employs Dr. Knight, Dr. McKnight? Well, Your Honor, this is a new issue that counsel raised in his reply brief. It sounds to me like a bias complaint, and a bias is a very, very high hurdle that the claimant has to overcome. And he hasn't overcome it. If the court would like me to brief the bias issue, I'd be more than happy to do that after argument. But the HALEX provision that he's talking about, saying that the ALJ should use E-rotation as soon as possible, so it's not mandatory. It doesn't happen all the time. And what he argued in the brief was that over, I believe it was a three-year period, that this Dr. McKnight was called on 12 occasions. So that would break down to what, four times a year? So once a quarter? I mean, when you think about all the ALJ hearings that are being held every single day, you know, maybe 10 a day, five days a week, that's nothing. I mean, that makes nothing. It's pure speculation that he called this particular medical expert for any particular reason. But in this particular case, he simply got another evaluation, which is exactly what the doctor recommended. So even if he provided his testimony while he was seated in the hearing room, the result would have been the same. It's his burden to show harmlessness. And in the recent cases that this court has dealt with that error, the court has emphasized that determining the harmlessness of an error is case specific. The court looks to the facts of each case. And in particular here, I would like to, and I'm sorry to read, but as elegantly articulated in Ludwig, I'm just going to read this quote. Learning after a firm conviction has been formed that one's conviction is supported by additional evidence can affect the judge's level of confidence in his decision without affecting the outcome of the decision. And I would submit to you that that is very same wisdom applies here. Was I on the Ludwig panel? Yes. Yeah, it was, yeah, it was amazingly familiar when I was hearing the facts. And so here the same thing happens. He has not shown a substantial likelihood of prejudice by having Dr. McKnight testify over the telephone rather than sitting in the hearing room. And he fails to show that it affected his substantial rights and not merely his procedural rights. He also fails to show how the alleged error would have changed the outcome of the subsequent evidence, the subsequent evaluations simply confirmed Dr. Shalstrom's earlier conviction or earlier report that said he's a malingerer. He's over-reporting his symptoms. With regard, I'd like to talk just a little bit about the RFC. He's claiming that he has problems with his hands. And that's not supported in the record. Dr. Hillebrand didn't assess any limitations due to hand or finger problems. While he noted a decreased coordination in thumb opposition, evidently he didn't believe it was significant enough to impose any limitation for that. Other objective evidence in that same report shows that the claimant's hands, fingers, and thumbs were normal. His grip strength was five out of five in both hands. He had full range of motion in his fingers and thumbs. Dr. Hillebrand wrote, full opposition, extension, and flexion bilaterally. Normal fists with both hands. The doctor said he could lift and carry at least 10 pounds with either hand on a frequent basis. And just one month prior to this, his own treating physician, Dr. Bonnevie, noted that he had good hand grip bilaterally. So there's no basis to his claim that he has trouble using his hands. And with regard to the repositioning of the shoulder, Dr. Hillebrand said that he may need postural repositioning because of his right shoulder pain. And again, Dr. Bonnevie, just a month before, noted an improved range of motion in his right shoulder. He's claiming that Dr. Hillebrand determined that he must have five minute breaks every 25 minutes. But that's not what Dr. Hillebrand said. What he said was the claimant could sit for at least 20 to 25 minutes uninterrupted as he did during the examination for a total of six out of eight hours. So the ALJ accommodated this need for shoulder repositioning by including in the RFC the ability to stand for up to five minutes in an hour of sitting. And how long does it take to reposition yourself? Five seconds, 10 seconds, maybe. And you don't even need to stand up to reposition your shoulder. I mean, the ALJ was more than generous in giving him that limitation of actually standing up. And even if he needed 10 minutes, as it has been claimed in the reply brief, if he needed 10 minutes, the VE testified that most sedentary positions will allow for standing up to five to 10 minutes an hour. I would submit that the ALJ provided a rational interpretation of the evidence and his ultimate non-disability decision is supported by substantial evidence. And unless the court has any other questions for me, I'll go ahead. The panel does not appear to have any additional questions. Thank you. Yes, Your Honors, there's another way an error can be harmful according to Shinseki v. Standards, and that's if the integrity or the fairness or the rule following of an agency is called into question by the error. In this case, again, we had the plaintiff's attorney objecting to the taking of telephonic testimony consistent with the regulations that could be characterized as a public perception problem, a perception that the agency won't follow its own rules even if your attorney objects. Regarding the HALEX provision I cited, my goal wasn't to make an argument of actual bias, but simply administrative irregularity and to suggest that this court wants to follow HALEX or consult it, they should consult it regarding the rotation of experts. The ALJ is not using this particular expert in rotation. He's getting them by phone. And the 12 times were with Dr. McKnight and ALJ Bauer, so it's somewhat targeted picking him administratively irregular. Dr. Heilbrun made some important findings about manual limitations. He found a bilateral tremor, and he found that the coordination of the hand and thumb was decreased. Claimant testified that he dropped things, and the lay witnesses said he dropped things. This would be important under Social Security ruling 96-9P. The claimant's limited to unskilled sedentary work. In order to have that work available, he has to have good bimanual dexterity. And it looks like from Dr. Heilbrun's clinical findings, the bimanual dexterity might be in question. And Charleston and Dixon, when they were reexamining the claimant, Charleston reaffirmed what he had found earlier that looked like a panic disorder, and that's why he added the social limitation, marked limitation in the ability to interact with supervisors. And Dr. Dixon didn't find malingering at all, and he also found social functioning would be fair to poor. That being said, I rest my case. All right. Thank you both for your argument. This matter will be submitted.
judges: Collins, Tashima, Callahan